UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X

JOAN GRANT BOYD, *ET AL.*,                    **NOT FOR PUBLICATION**

        Plaintiffs,              **ORDER ADOPTING IN**
                                              **PART AND MODIFYING**
  -against-                              **IN PART REPORT**
                                              **AND RECOMMENDATION**
J.E. ROBERT CO., *ET AL.*,

        Defendants.              05-CV-2455 (KAM)(RER)

-------------------------------------X

**MATSUMOTO, United States District Judge:**

        Plaintiffs Joan Grant Boyd ("Boyd"), Randa Jones
("Jones"), Sybil Taylor ("Taylor"), and Tonya Warters
("Warters") (collectively, "Plaintiffs") commenced this action
on behalf of themselves and a putative class of others similarly
situated against Defendants J.E. Robert Co., Inc. and JER
Revenue Services, LLC (collectively, the "JER Defendants" or
"JER"), and NYCTL 1996-1 Trust (the "1996-1 Trust"), NYCTL
1997-1 Trust (the "1997-1 Trust"), NYCTL 1998-1 Trust (the
"1998-1 Trust"), and NYCTL 1999-1 Trust (the "1999-1 Trust")
(collectively, the "Trust Defendants"), alleging violations of
the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et
seq.* ("FDCPA") and New York statutory and common law.  After
extensive motion practice directed at the sufficiency of
Plaintiffs' complaint, the following claims remain: (1) Boyd's
and Jones' FDCPA claims against the JER Defendants and the

1998-1 Trust; (2) Plaintiffs' statutory claims pursuant to New York General Business Law § 349 ("GBL") against all Defendants; (3) Plaintiffs' breach of contract claims against all Defendants; and (4) Plaintiffs' unjust enrichment claims against all Defendants.  On November 23, 2011, the JER Defendants and Trust Defendants each filed a motion for summary judgment on the remaining claims, and the court referred those motions to Magistrate Judge Ramon E. Reyes for a Report and Recommendation. (*See* Order dated 2/13/12.)

Presently before the court is the Report and Recommendation issued by Judge Reyes on August 27, 2012 recommending that Defendants' motions for summary judgment be granted in part and denied in part. (ECF No. 241, Report and Recommendation dated 8/27/12 ("R&R") at 1.)  Specifically, Judge Reyes recommended granting summary judgment on the FDCPA, GBL § 349, and breach of contract claims but recommended denying summary judgment on the unjust enrichment claims. (*Id.* at 38.) Finally, Judge Reyes recommended that the court decline to exercise supplemental jurisdiction over Plaintiffs' state law claims if the court dismissed the FDCPA claims. (*Id.* at 37.)

The JER Defendants, Trust Defendants, and Plaintiffs each filed timely objections to the R&R and subsequently submitted responses to each other's objections. (*See* ECF No.

243, JER Defendants' Objections to Judge Reyes' R&R ("JER
Obj."); ECF No. 244, Trust Defendants' Objections to Judge
Reyes' R&R ("Trust Obj."); ECF No. 245, Plaintiffs' Objections
to Judge Reyes' R&R ("Pls.' Obj."); ECF No. 247, Plaintiffs'
Response to Defendants' Objections ("Pls.' Resp. to Obj."); ECF
No. 248, Trust Defendants' Response to Plaintiffs' Objections
("Trust Resp. to Obj."); ECF No. 249, JER Defendants' Response
to Plaintiffs' Objections ("JER Resp. to Obj.").)  In light of
the parties' timely objections, the court has undertaken a *de
novo* review of the full record including the applicable law, the
underlying record, the parties' submissions on the instant
motions along with accompanying affidavits, the R&R, the
parties' objections to the R&R, and the parties' respective
responses to those objections.  *See* 28 U.S.C. § 636(b)(1).  For
the reasons set forth below, the court respectfully adopts in
part and modifies in part Judge Reyes' R&R and grants
Defendants' motions for summary judgment.

<u>**BACKGROUND**</u>

        The detailed facts and procedural history of this case
have been set forth previously in Judge Reyes' R&R and this
court's prior Order on Defendants' motion to dismiss. (*See* R&R
at 2-7; ECF No. 191, Order Adopting Report and Recommendation
dated 2/2/11 ("2/2/11 Order").)  Accordingly, to the extent

established in the submissions regarding the Defendants' motions

for summary judgment, the court repeats the relevant facts here

only as necessary for the analysis below.  The court has

considered whether the parties have proffered admissible

evidence in support of their positions and has viewed the facts

in the light most favorable to the nonmoving party.[1]

I.   **Statement of Facts**

   **A. The New York City Tax Liens**

        As an incident of property ownership in New York City

("the City"), the City imposes upon commercial and residential

property owners property taxes, water and sewer charges,[2] and

other statutory charges, all of which give rise to a New York

City Tax Lien ("Tax Lien") against the property to secure such

amounts if not paid. N.Y.C. Admin. Code § 11-301; (*See* ECF No.

227, JER Defendants' Statement of Material Facts Pursuant to

Local Rule 56.1 dated 6/3/12 ("JER 56.1 Stmt.") ¶ 3; ECF No.

235, Plaintiffs' Response to JER Defendants' Rule 56.1 Statement

---

[1] Unless otherwise noted, these facts are established by admissible evidence and are undisputed by admissible contrary evidence.

[2] Water and sewer charges are typically determined based on the physical characteristics of property, such as the building width and the number of stories, dwelling units, and fixtures. (*See* ECF No. 220, Trust Defendants' Rule 56.1 Statement dated 6/3/11 ("Trust 56.1 Stmt.") ¶ 1; ECF No. 234, Plaintiffs' Response to Trust Defendants' Rule 56.1 Statement dated 10/5/11 ("Pls.' Resp. to Trust 56.1 Stmt.") ¶ 1.)  The water and sewer charges were adjusted according to the number of showers, baths, or other fixtures. (ECF No. 233, Exh. YYY, Deposition of Steven Lawitts ("Lawitts Dep.") at 46:13-16.)  The water and sewer charges on Boyd's home, however, were metered based on water use. (*See* JER 56.1 Stmt. ¶ 13; Lawitts Dep. at 26:11-17.)  Additionally, water services could be terminated as a result of lack of payment. (*See* Lawitts Dep. at 49-52.)

dated 10/5/11 ("Pls.' Resp. to JER 56.1 Stmt.") ¶ 3.)  The New York City Administrative Code mandates in relevant part: "[t]he owner of a dwelling shall provide and maintain a supply of . . . water sufficient in quantity and at sufficient pressure to keep all plumbing fixtures adequately supplied for their sanitary maintenance.  Where water mains are available in the street, every dwelling shall be supplied with water from such mains." N.Y.C. Admin. Code § 27-2024.  Liens that remain unpaid for one year are deemed delinquent and may be foreclosed. *See* N.Y.C. Admin. Code §§ 11-354, 11-404(a).  The City may sell these delinquent liens, and the buyers of such liens are authorized to collect interest at the rate of 18%, a 5% surcharge, and attorneys' fees accrued during any action to foreclose upon such liens. *See* N.Y.C. Admin. Code §§ 11-319, 11-332, 11-335.

Plaintiffs Boyd, Jones,[3] Taylor, and Warters claim to have an interest in real property subject to Tax Liens that secured amounts owed for real estate taxes, water and sewer charges, and other statutory charges. (*See* JER 56.1 Stmt. ¶ 3.) Those properties include the following: (A) 480 Quincy Street,

---

[3] Defendants contend that, contrary to Jones' testimony, Jones did not own the Jones Property at the time the charges accrued.  According to Trust Defendants, Jones took title to the property by deed dated October 31, 2002, which Jones admits. (Trust 56.1 Stmt. ¶ 15; Pls.' Resp. to Trust 56.1 Stmt. ¶ 15.) Jones, however, asserts that she acquired certain equitable and statutory rights prior to the October 31, 2002 deed. (*See* Pls.' Resp. to Trust 56.1 Stmt. ¶ 15.)  This fact is not material to any of the parties' objections now before the court, and neither party appears to attach any significance to this fact in their objection papers.

Brooklyn, New York (the "Jones Property"); (B) 1459 Carroll
Street, Brooklyn, New York (the "Boyd Property")[4]; (C) 1152
Wheeler Avenue, Bronx, New York (the "Taylor Property"); and (D)
128-39 Inwood Street, Queens, New York (the "Warters Property").
(JER 56.1 Stmt. ¶ 8; Pls.' Resp. to JER 56.1 Stmt. ¶ 8.)   In
1996, the City sold the Tax Liens on each of these four
properties to the Trust Defendants, who in turn retained JER
Defendants to service the Tax Liens and assist in collecting the
amounts secured by those Tax Liens. (*See* JER 56.1 Stmt. ¶ 1;
Pls.' Resp. to JER 56.1 Stmt. ¶ 1.)

     Although the amounts secured by the Tax Liens on each
property varied, the Tax Liens were predominantly composed of
real property taxes and water and sewer surcharges.  The Jones
Property, for example, was subject to a Tax Lien of $15,676.41,
including $4,210.17 in real property taxes, $10,678.89 in water
and sewer charges, a statutory surcharge of $746.50, and a
$40.85 advertising charge. (ECF No. 220, Trust Memorandum in
Support of Motion for Summary Judgment ("Trust Mem.") at 5; JER
56.1 Stmt. ¶ 19; Pls.' Resp. to JER 56.1 Stmt. ¶ 19.)
Similarly, the Boyd Property was subject to a Tax Lien of
$12,217.85, including $8,046.01 in real property taxes,

---

[4] The Boyd Property was jointly owned by Joan Boyd and former
Plaintiff Thomas Boyd. (*See* ECF No. 233, Exh. CC, Boyd Indenture, at JER2
00332.)

$2,403.04 in water and sewer charges, a $1,146.15 sidewalk repair charge, a statutory surcharge of $581.80, and a $40.85 advertising charge. (Trust Mem. at 6-7; JER 56.1 Stmt. ¶ 19; Pls.' Resp. to JER 56.1 Stmt. ¶ 19.)  The Taylor Property was subject to three separate Tax Liens, each composed of unpaid real property taxes and water and sewer charges. (Trust 56.1 Stmt. ¶ 30; Pls.' Resp. to Trust 56.1 Stmt. ¶ 30.)  The Warters Property was subject to two separate Tax Liens, each composed of unpaid real property taxes and water and sewer charges. (Trust 56.1 Stmt. ¶ 36; Pls.' Resp. to Trust 56.1 Stmt. ¶ 36.) Notably, Plaintiffs do not dispute any of the principal amounts alleged to be due and owing under the foregoing Tax Liens. (JER 56.1 Stmt. ¶ 19; Pls.' Resp. to JER 56.1 Stmt. ¶ 19.)

**B. The Foreclosure Actions**

On each of these Tax Liens, JER Defendants managed collection efforts, maintained records, and accounted for the amounts collected. (JER 56.1 Stmt. ¶ 7; Pls.' Resp. to JER 56.1 Stmt. ¶ 7.)  JER Defendants also entered into retainer agreements with outside counsel to foreclose upon the delinquent Tax Liens in New York state court, and Plaintiffs concede that they were not parties to any of these retainer agreements. (JER 56.1 Stmt. ¶ 67; Pls.' Resp. to JER 56.1 Stmt. ¶ 67.) Plaintiffs further concede that they are not signatories to any

7

contract with any of the Defendants in this action. (JER 56.1 Stmt. ¶¶ 20-23; Pls.' Resp. to JER 56.1 Stmt. ¶¶ 20-23.)

In accordance with those retainer agreements, JER's outside counsel commenced foreclosure actions against the four properties subject to the delinquent Tax Liens. (See ECF No. 233, Exh. H, Foreclosure Complaint Against Jones Property ("Jones Foreclosure Compl."); Exh. EE, Foreclosure Complaint Against Boyd Property ("Boyd Foreclosure Compl."); Exh. SS, Foreclosure Complaint Against Warters Property ("Warters Foreclosure Compl."); Exh. JJJ, Foreclosure Complaint Against Taylor Property ("Taylor Foreclosure Compl.").)  Plaintiffs, with the exception of Boyd, indicated in their interrogatories that they retained counsel to represent them "with respect to the relevant tax lien or any foreclosure with respect thereto." (ECF No. 227, Exh. 4, Plaintiffs' Responses to Interrogatories ("Pls.' Resp. to Def. Interrog.") 5.).[5]  Boyd later indicated that during the pendency of the foreclosure action, she was represented by counsel in the refinancing of her home, a transaction which required the payoff of amounts owed to resolve the foreclosure of the Tax Lien. (JER 56.1 Stmt. ¶ 30; Pls.' Resp. to JER 56.1 Stmt. ¶ 30.)  In addition, Boyd testified that

---

[5]  Plaintiffs' Responses to Interrogatory 5 contain two sets of questions and two sets of answers, the second of which relate to Plaintiffs' representation by counsel during the foreclosure actions.

her attorney, Michael Bennett, Esq., requested a payoff quote from the JER Defendants in the Boyd Property foreclosure action. (ECF No. 227, Exh. 2, Deposition of Joan Boyd ("Boyd Dep.") at 53:6-20.)

## C.   Attorneys' Fees, Litigation Costs, and Expenses Associated with the Foreclosure Actions

In each of the foreclosure actions, JER's outside counsel sought to foreclose the liens, sell the properties, and thereby recover amounts due on the Tax Liens along with interest, costs, allowances, disbursements, attorneys' fees, and expenses of the sale that JER incurred and paid to foreclosure counsel. (*See* Jones Foreclosure Compl. at JER2 07098; Boyd Foreclosure Compl. at 7; Warters Foreclosure Compl. at JER2 07289; Taylor Foreclosure Compl. at JER2 10432.)  Moreover, each foreclosure action gave rise to various costs including filing fees, title searches, service of process fees, and attorneys' fees. (*See* JER 56.1 Stmt. ¶ 55; ECF No. 228, Affidavit of John Chilson ("Chilson Aff.") ¶ 19.)[6]

---

[6] Plaintiffs object to the admissibility of Mr. Chilson's affidavit on the basis that his assertions related to the delinquent Tax Liens, JER's communications and correspondence with Plaintiffs, and costs incurred by JER's outside counsel are unsupported by personal knowledge. (*See generally* Pls.' Resp. to JER 56.1 Stmt.)  Plaintiffs, however, posit no reasoned explanation for this objection, which is peppered repeatedly throughout their Response to JER's 56.1 Statement.  In fact, Mr. Chilson testified to his supervisory authority at JER Revenue Services, LLC as a former Senior Vice President and current Managing Director of the firm. (Chilson Aff. ¶ 2.)  Furthermore, Mr. Chilson averred that his testimony was based upon "personal knowledge and the regularly maintained business records

Notably, none of the foreclosure actions sought monetary relief against any individual and instead sought the foreclosure and sale of the relevant property to recover the amounts due under the Tax Liens.  Further, none of the foreclosure complaints sought a deficiency, if necessary, against any individual. (Chilson Aff. ¶ 16; *see also* Jones Foreclosure Compl.; Boyd Foreclosure Compl.; Warters Foreclosure Compl; Taylor Foreclosure Compl.)

Plaintiffs challenge the accuracy and propriety of legal fees and costs charged by JER Defendants' outside counsel, which legal fees and costs were represented by the JER Defendants to be "estimates" in response to inquiries from Plaintiffs' counsel for payoff figures.  Specifically, Plaintiffs assert that outside counsel's billing records are

---

of JER." (*Id.* ¶ 3.) In the Second Circuit, the test for determining a witness' personal knowledge is "whether a reasonable trier of fact could believe the witness had personal knowledge." *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 764 (2d Cir. 1991).  In light of Mr. Chilson's managerial position, supervisory authority, and familiarity with the regularly maintained business records of his firm, a reasonable trier of fact could find that he had personal knowledge of the status and nature of Tax Liens serviced by his firm, proceedings connected to those Tax Liens, the interactions with parties participating in those proceedings, and the expenses incurred by outside counsel hired by his firm to foreclose the Tax Liens. In any event, Plaintiffs fail to provide any specific reason to question Mr. Chilson's personal knowledge of the facts contained in his affidavit and do not contend that it is based upon conjecture or hearsay. Furthermore, Plaintiffs rely upon Mr. Chilson's affidavit in their objection to Judge Reyes' R&R. (*See, e.g.*, Pls.' Obj. at 28.)  The court is not persuaded by Plaintiffs' challenge to the admissibility of a document upon which they selectively rely.  Thus, the cited facts from Mr. Chilson's affidavit are considered to the extent that they constitute admissible evidence sufficient to support JER's Rule 56.1 Statement.

riddled with inconsistencies and inaccuracies.  First, JER
Defendants purportedly charged Warters two separate legal fees
for "Publication" when the docket sheet in the foreclosure
action and billing records indicate that outside counsel
prepared and filed only one order of publication. (*Compare* ECF
No. 233, Exh. DDD, Legal Fees for Warters Property Foreclosure
("Warters Legal Fees"), *with* Exh. XX, Docket Sheet of Warters
Foreclosure Action ("Warters Docket"), *and* Exh. EEE, Billing
Records for Warters Property Foreclosure ("Warters Billing
Records"), at JER2 07028.)  Second, Defendants allegedly billed
Taylor a $45 filing fee and $95 RJI fee, when the foreclosure
docket sheet demonstrates that neither filing occurred. (*Compare*
ECF No. 233, Exh. UUU, Taylor Disbursement Summary, at JER2
7063, *with* Exh. HHH, Docket Sheet of Taylor Foreclosure Action
("Taylor Docket").)  Third, Plaintiffs allege that outside
counsel's billing records for the Jones foreclosure action
include inconsistencies because outside counsel logged 6.60
hours of work but billed Defendants for 7.14 hours of work.
(*Compare* ECF No. 233, Exh. U, Jones Billing Record, at JER2
07035, *with* Exh. O, Jones Recoverable Legal Costs, at JER2
00241.)  Finally, Defendants purportedly collected a $225 legal
fee from Boyd for "Judgment Granted" despite the Boyd
foreclosure's discontinuance prior to entry of judgment.

(*Compare* ECF No. 233, Exh. PP, Boyd Itemized Costs, *with* Exh. NN, Docket of Boyd Foreclosure in King County Court ("Boyd Docket").)

As set forth herein, Plaintiffs received refunds from the defendants for overpaid amounts once the JER Defendants received the billings from outside counsel and reconciled the estimated payments of fees and costs. The refunds from the JER Defendants were sent to Plaintiffs' counsel, as required.

**D.   Plaintiffs' Requests for Payoff Quotes**

The parties agree that taxpayers or their counsel may inquire as to the amounts necessary to discharge the Tax Liens on their respective properties and resolve the foreclosure actions, and JER Defendants were available to respond to such inquiries with payoff quotes. (JER 56.1 Stmt. ¶¶ 60-62; Pls.' Resp. to JER 56.1 Stmt. ¶¶ 60-62.) For instance, Jones' attorney, William Simms, Esq., and Jones' title insurance company, Home Abstract, contacted JER Defendants on Jones' behalf to request a payoff quote, which JER Defendants subsequently provided via fax.[7] (ECF No. 233, Exh. K, Payoff

---

[7] Plaintiffs assert that there are references in the Communications History to letters that may have been sent directly to Jones. (*See* Pls.' Resp. to JER 56.1 Stmt. ¶ 37; Jones Communication History, at JER2 00279.) However, Jones testified that she does not recall talking to, or receiving correspondence from, anyone affiliated with JER Defendants. (ECF No. 227, Exh. 3, Deposition of Randa Jones dated 12/3/09 ("Jones Dep.") at 18:12-19:15.)

Quote Request Fax dated 10/24/02, ("10/24/02 Jones Payoff Quote Request"); Exh. C, Jones Communication History, at JER2 0281-82.)  As Judge Reyes correctly discerned, the record does not contain a copy of the October 24, 2002 Payoff Quote.

Likewise, Boyd alleges that on May 20, 2002, she and her late husband, Thomas Boyd, requested a payoff quote for the Boyd Property, which JER Defendants subsequently provided. (ECF No. 233, Grobman Declaration ("Grobman Decl.") ¶ 67; ECF No. 233, Exh. AA, Thomas Boyd Communication History, at JER2 00385; Exh. FF, Boyd Payoff Quote dated 5/20/2002 ("5/20/02 Boyd Payoff Quote.")  The May 20, 2002 Boyd Payoff Quote enumerated a tax lien balance of $14,612.42, an estimate of legal fees and costs of $4,100.00, and a total amount due of $18,712.42. (5/20/02 Boyd Payoff Quote at P00246.)  The payoff quote indicated that "an estimate of legal fees and costs is included" and that "[a]ctual legal fees and costs may be different than the estimate." (*Id.*)

After receipt of the May 20, 2002 Payoff Quote that he requested, Thomas Boyd entered into a Forbearance Agreement with Bank of New York as Trustee, Collateral Agent, and Custodian of the 1998-1 Trust. (JER 56.1 Stmt. ¶ 24; ECF No. 233, Exh. GG, Forbearance Agreement Between Thomas Boyd and Bank of New York ("Forbearance Agreement") at P00290-91.)  Thereafter, all

13

payments made from an attorney trust account against the Tax
Lien on the Boyd Property proceeded under the terms of the
Forbearance Agreement.  (Chilson Aff. ¶ 29; JER 56.1 Stmt. ¶ 33;
Pls.' Resp. to JER 56.1 Stmt. ¶ 33.)  Plaintiff Boyd was not a
signatory of the Forbearance Agreement, signed by her husband as
the "Taxpayer," which contained the following relevant
provisions:

> Fees and costs of collection may have been
> incurred if the Tax Lien was referred for
> foreclosure and such fees and costs of
> collection, including [but] not limited to,
> attorney's fees, title search fees, process
> server expenses, court filing costs, and
> publication expenses (the "fees and Costs of
> Collection"), if any, are owed by the
> Taxpayer to the Trusts . . . .
>
> [ . . . ]
>
> WAIVER OF DEFENSES. The Taxpayer hereby
> waives any and all defenses, counterclaims
> and setoffs, whether known or unknown,
> including but not limited to contesting the
> amount owed, to any current or future
> foreclosure action on the Tax Lien. The
> Taxpayer shall not defend or oppose any
> current or future foreclosure action on the
> Tax Lien.

(Chilson Aff. ¶ 30; Forbearance Agreement, at P00290.)

On April 4, 2003, attorney Michael Bennett, Esq.,
advising that he was retained by the Boyds in connection with
refinancing the Boyd Property, requested an updated payoff quote
on the Boyd Property on behalf of the Boyds. (*See* JER 56.1 Stmt.

14

¶¶ 30-31; Boyd Dep. at 52:15-53:21; Pls.' Resp. to JER 56.1 Stmt. ¶¶ 30-31; ECF No. 233, Exh. HH, Attorney Michael Bennett's Request for Updated Payoff Quote dated 4/4/03 ("4/4/03 Bennett Request"), at JER2 00304; Thomas Boyd Communication History, at JER2 00390.)   In response, JER Defendants subsequently faxed the updated payoff quote to Bennett. (JER 56.1 Stmt. ¶ 32; Pls.' Resp. to JER 56.1 Stmt. ¶ 32.)   Although the record contains no copy of the updated Boyd payoff quote, the Tax Lien was subsequently paid and the foreclosure discontinued. (*See* Chilson Aff. ¶ 20; JER 56.1 Stmt. ¶ 17; Pls.' Resp. to JER 56.1 Stmt. ¶ 17.)

Plaintiffs Taylor and Warters, through counsel, also requested and received payoff quotes from JER Defendants. (*See* JER 56.1 Stmt. ¶¶ 43-45, 49-50; Pls.' Resp. to Def. Interrog. 5(d); Pls.' Resp. to JER 56.1 Stmt. ¶¶ 43-45, 49-50; ECF No. 233, Exh. VV, Warters Payoff Quote dated 6/22/04 ("6/22/04 Warters Payoff Quote"); Exh. PPP, Taylor Payoff Quote dated 11/21/03 ("11/21/03 Taylor Payoff Quote").)   The Warters Payoff Quote enumerated a tax lien balance of $37,070.49, an estimate of legal fees and costs of $13,210.66, and a total amount due of $50,281.15. (6/22/04 Warters Payoff Quote, at 12.)   Similarly, the Taylor Payoff Quote enumerated a tax lien balance of $17,225.83, an estimate of legal fees and costs of $7,509.40,

and a total amount due of $24,735.23. (11/21/03 Taylor Payoff Quote, at JER2 01282.)  Like the May 20, 2002 Boyd Payoff Quote, both the Warters and Taylor Payoff Quotes indicated that "[i]f a foreclosure has already been commenced, an estimate of legal fees and costs is included" and that "[a]ctual legal fees and costs may be different than the estimate." (6/22/04 Warters Payoff Quote, at 12; 11/21/03 Taylor Payoff Quote, at JER2 01282.)

**E.   Foreclosure Discontinuances & Overpayment Refunds**

Eventually, the payoff amounts identified in the respective payoff letters were paid, thereby redeeming the delinquent Tax Liens on each property and resolving the foreclosure actions. (Chilson Aff. ¶ 20; JER 56.1 Stmt. ¶ 17; Pls.' Resp. to JER 56.1 Stmt. ¶ 17.)  Consequently, the remaining foreclosure actions on the four properties were discontinued prior to entry of judgment in the state courts.[8] (*See* JER 56.1 Stmt. ¶ 17; Pls.' Resp. to JER 56.1 Stmt. ¶ 17.) Defendants maintain that the foreclosures were discontinued in reliance on the payoff for the Tax Liens. (JER 56.1 Stmt. ¶¶ 34, 41, 47, 52; Chilson Aff. ¶¶ 20, 35, 49, 52.)

---

[8] The Taylor Property was subject to three separate Tax Liens and three respective foreclosure actions on each of those liens. One of the foreclosure actions on the Taylor Property went to judgment, and in that action, attorneys' fees were awarded by the state court. (Chilson Aff. ¶ 50.)

The record before this court includes the Notice of
Discontinuance of the foreclosure on the Jones Property but
contains no corresponding notices for the other three
properties.  The Jones Property Notice of Discontinuance
includes the following relevant provisions:

> 2. This action was commenced to foreclose a
> certain tax lien certificate originally in
> the sum . . . $18,283.20 . . . as of June 1,
> 2001, with interest thereon at a rate of 18%
> compounded daily affecting property located
> at 480 Quincy Street, Brooklyn, New York.
>
> [ . . . ]
>
> [I]t is hereby stipulated and agreed that
> the within foreclosure action be marked
> discontinued and the Notice of Pendency
> filed herein on June 6, 2002 be canceled of
> record.

(ECF No. 233, Exh. N, Notice of Discontinuance of Foreclosure on
Jones Property ("Jones Property Notice of Discontinuance"), at
JER2 07085.)

The payoff amounts that were remitted to JER upon
discontinuance of the foreclosure actions included amounts that
JER thereafter determined were overpayments, and JER
subsequently refunded the overpaid amounts without interest to
Plaintiffs or their counsel. (*See* JER 56.1 Stmt. ¶ 62; Pls.'
Responses to JER 56.1 Stmt. ¶ 62.)  Jones received a $295.00
refund; former plaintiff Thomas Boyd received a $663.85 refund;

Warters received a $5,250.21 refund; and Taylor received a
$2,382.86 refund. (*See* ECF No. 233, Exh. W, Refund Letter from
JER Defendants to Attorney of Plaintiff Jones ("Jones Refund
Letter"), at JER2 00243; Exh. RR, Refund Letter from JER
Defendants to Title Insurer of Thomas Boyd ("Boyd Refund
Letter"), at JER2 00301; Exh. CCC, Refund Letter from JER
Defendants to Attorney of Plaintiff Warters ("Warters Refund
Letter"), at JER2 01291; Exh. XXX, Refund Letter from JER
Defendants to Attorney of Plaintiff Taylor ("Taylor Refund
Letter"), at JER2 01279.)

On November 12, 2008, Plaintiffs filed their Second
Amended Complaint alleging violations of FDCPA §§ 1692e and
1692f as to Plaintiffs Boyd and Jones and claims as to all
Plaintiffs under New York's GBL § 349 and New York common law.
(*See* ECF No. 83, Second Amended Complaint dated 11/12/08
("Compl.") ¶ 1.)  Following discovery, JER Defendants and Trust
Defendants separately moved for summary judgment, and their
motions were referred to Judge Reyes for report and
recommendation. (Order dated 2/13/12.)

II.  **Judge Reyes' Report and Recommendation**

On August 27, 2012, Judge Reyes issued an R&R
recommending dismissal of all of Plaintiffs' claims with the
exception of Plaintiffs' unjust enrichment claims. (R&R at 38.)

18

Judge Reyes further recommended that the court decline to exercise supplemental jurisdiction over any of Plaintiffs' remaining state law claims should the court accept his recommendation to dismiss the FDCPA claims of Plaintiffs Jones and Boyd. (*Id.*)

## A.    The FDCPA Claims

Judge Reyes first rejected Jones' and Boyd's claims under §§ 1692e and 1692f of the FDCPA. (*Id.* at 9-23.)  With respect to the § 1692e claims, Judge Reyes found that Plaintiffs Jones and Boyd abandoned those claims by failing to "directly address Defendants' substantive challenges to their § 1692e claims" and neglecting to "defend the merits of such claims." (*Id.* at 11.)

Moreover, Judge Reyes determined that, even assuming Plaintiffs preserved their § 1692e claims, the claims failed on the merits in light of the Second Circuit's *dicta* in *Kropelnicki v. Siegel*, 290 F.3d 118 (2d Cir. 2002). (*See* R&R at 13.) Applying *Kropelnicki*, Judge Reyes determined that § 1692e was inapplicable to purported misrepresentations directed solely to a debtor's attorney and thus recommended dismissal of Plaintiffs' § 1692e claims. (*Id.* at 14.)  Additionally, relying upon this court's February 2, 2011 Order, Judge Reyes concluded that any communications initiated by Plaintiffs and/or their

attorneys were not actionable under the FDCPA. (*Id.* at 14-15 (citing 2/2/11 Order at 15-16).)  Finally, Judge Reyes noted that Plaintiffs did not submit supporting evidence to establish that Defendants ever initiated direct correspondence with Jones and Boyd, and that Plaintiffs did not assert that any of the communications resulted in substantive violations of § 1692e, and in any event, Plaintiff Jones testified that she had no recollection of talking with or receiving correspondence from JER or its affiliates. (*Id.* at 15.) For these reasons, Judge Reyes recommended dismissing Jones' and Boyd's § 1692e claims. (*Id.*)

With respect to the § 1692f claims, Judge Reyes recommended dismissal based upon the following three conclusions: first, Defendants did not violate the FDCPA because they collected attorneys' fees and costs that were "permitted by law" under N.Y.C. Admin. Code § 11-335 and the N.Y.C.P.L.R.; second, such fees and costs were collected pursuant to settlement agreements between JER Defendants and Plaintiffs Boyd and Jones and were therefore authorized by the FDCPA; and third, JER Defendants are not liable under the FDCPA for failure to pay interest on overcharges refunded to Plaintiffs. (*Id.* at 16-23.)

Because Judge Reyes recommended dismissal of Plaintiffs' FDCPA claims, he further recommended that the court

decline to exercise supplemental jurisdiction over Plaintiffs'
remaining state law claims. (*Id.* at 37.)  Despite his
recommendation regarding the state law claims, Judge Reyes
nevertheless took care to issue detailed recommendations on the
merits of Plaintiffs' state law claims.

**B.    State Law Claims**

Judge Reyes found that Plaintiffs' GBL § 349 claims
failed as a matter of law. (*Id.* at 26.)  As a threshold matter,
Judge Reyes concluded that Plaintiffs lacked standing to bring
any claims "based on the content of the retainer agreements"
between JER Defendants and outside counsel. (*Id.* at 24.)
Specifically, Judge Reyes reasoned that Plaintiffs were neither
parties to, nor third party beneficiaries of, the retainer
agreements between JER Defendants and outside counsel. (*Id.* at
24-25.)  Additionally, Judge Reyes further rejected Plaintiffs'
GBL § 349 claims on the merits because Plaintiffs failed to
establish that Defendants' conduct was consumer-oriented,
deceptive, or materially misleading. (*Id.* at 26-29.)

Additionally, Judge Reyes recommended dismissal of
Plaintiff's breach of contract claims. (*Id.* at 26.)  First,
Judge Reyes noted that Plaintiffs were not parties to any
contract for legal fees between Defendants and outside counsel
and, thus, could not base any breach of contract claim on those

retainer agreements. (*Id.*)  Second, although Judge Reyes found
that Plaintiff Boyd had standing to bring a breach of contract
claim under the Forbearance Agreement as a third party
beneficiary, Judge Reyes ultimately determined that Plaintiffs
failed to establish a breach of that agreement. (*Id.* at 30-31.)
Specifically, Judge Reyes found that because Plaintiff Boyd
failed to present evidence that JER Defendants collected and
retained legal fees and costs not actually incurred, she could
not establish a breach of the Forbearance Agreement as a matter
of law. (*Id.* at 31.)

        In contrast, Judge Reyes recommended denying summary
judgment on Plaintiffs' unjust enrichment claims, but only to
the extent that Plaintiffs could prove "that outside counsel
charged for services not rendered or for costs not incurred."
(*Id.* at 34-35.)  Judge Reyes first decided that Defendants were
enriched because they retained the benefit of satisfying their
debt to outside counsel. (*Id.* at 32.)  Furthermore, Judge Reyes
found unpersuasive Defendants' contention that, because
Plaintiffs benefitted from the discontinuances of the
foreclosures, Defendants were not enriched "at Plaintiffs'
expense" under *Clark v. Darby*, 751 N.Y.S.2d 622 (N.Y. App. Div.
3d Dep't 2002). (*Id.* at 32-33.)  Judge Reyes noted that
Plaintiffs could show that they operated under a mistake of fact

to the benefit of the Defendants, who used Plaintiffs' payoff
amounts to pay debts owed to outside counsel. (*Id.* at 33.)  To
that end, Judge Reyes listed several amounts paid by Plaintiffs
to outside counsel (through JER Defendants) to which outside
counsel were not entitled. (*Id.* at 33-34.)  Because "Plaintiffs
cite[d] to evidence in the record from which a reasonable fact
finder could conclude that Defendants collected expenses not in
fact incurred by outside counsel," Judge Reyes declined to
dismiss Plaintiffs' unjust enrichment claims. (*Id.* at 35.)

Finally, Judge Reyes summarily rejected Defendants'
assertion that Plaintiffs' state law claims – including the
unjust enrichment claims – were barred by the doctrines of *res
judicata*, estoppel, and voluntary payments. (*Id.* at 35-36.)
Finding these defenses inapplicable, Judge Reyes ultimately
recommended that Plaintiffs' unjust enrichment claims should
survive summary judgment. (*Id.*)

## STANDARDS OF REVIEW

## I.   Review of a Report and Recommendation

Where, as here, a party makes specific and timely
objections to a magistrate judge's findings or recommendations,
the district court must apply a *de novo* standard of review to
the portions of the R&R to which the objection is made. *See* 28
U.S.C. § 636(b)(1); *Mazzei v. Abbott Labs. & Co.*, No. 10-CV-

23

1011, 2012 WL 1101776, at *1 (E.D.N.Y. Apr. 2, 2012) (citing *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 116 (2d Cir. 2010)). Upon such *de novo* review, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  Where no objection to the R&R has been filed, however, the district court "'need only satisfy itself that there is no clear error on the face of the record.'"  *Urena v. New York*, 160 F. Supp. 2d 606, 609-10 (S.D.N.Y. 2001) (quoting *Nelson v. Smith*, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985)).

## II.   <u>Summary Judgment</u>

"One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477

24

U.S. 242, 248 (1986).

Thus, the court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citing *Anderson*, 477 U.S. at 255). The moving party carries the initial burden of demonstrating an absence of evidence to support the nonmoving party's case. *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (citing *Celotex*, 477 U.S. at 323). The nonmoving party then "must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)) (internal quotation marks omitted) (emphasis in original). To defeat a summary judgment motion, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

## DISCUSSION

In light of the parties' timely objections, the court has reviewed *de novo* Judge Reyes' R&R.  JER Defendants raise two threshold objections, challenging the applicability of the FDCPA that, if granted, render moot many of Plaintiffs' objections. For this reason, the court first addresses Defendants' threshold objections regarding the FDCPA's applicability to this case and thereafter discusses Plaintiffs' objections only as necessary.

### I.   JER Defendants' Objections[9]

Despite their agreement with the overall result reached by Judge Reyes, JER Defendants object to the R&R "to the extent that it failed to decide [two threshold] issues, each of which would constitute an alternate ground for granting summary judgment in favor of the Defendants" on Jones' and Boyd's FDCPA claims. (JER Obj. at 1.)  Mindful that Judge Reyes found it unnecessary to reach these two issues to dispose of the FDCPA claims, the court nevertheless considers both objections upon *de novo* review.  After careful consideration, the court finds Defendants' objections to have merit and modifies Judge Reyes' R&R accordingly.

---

[9] Trust Defendants adopt and incorporate by reference the objections submitted by JER Defendants but advance no additional objections to the R&R. (*See* Trust Obj. at 1.)

26

**A.   Objection One: The City Tax Liens at Issue Are Not "Debts" Under the FDCPA.**

Defendants contend that Jones' and Boyd's respective FDCPA claims fail as a threshold matter because the Tax Liens do not constitute "debts" covered by the FDCPA. (JER Obj. at 2.) The FDCPA defines the term "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5). Defendants submit that a debt must arise out of a consensual, negotiated transaction involving "an exchange for a service or property." (JER Obj. at 3 (citing *Beggs v. Rossi*, 145 F.3d 511 (2d Cir. 1998) (per curiam)).) According to Defendants, the Tax Liens did not arise from consensual, negotiated transactions because the real property taxes, water charges, and sewer charges secured under the Tax Liens are mandatorily imposed as an incident to real property ownership in New York City and are therefore more analogous to compulsory taxes, which fall outside the FDCPA's protective ambit. (*Id.* at 4-5 (citing *Beggs*, 145 F.3d at 512).) The court agrees and therefore sustains Defendants' first objection to the R&R.

27

The protections afforded consumers under the FDCPA prohibit conduct intended to harass, oppress, abuse, deceive, or mislead any person in connection with the collection of a "debt." *See* 15 U.S.C. §§ 1692d, 1692e.  Consequently, "[a]s a threshold matter, a suit brought under the FDCPA must involve a 'debt' within the meaning of the statute." *Patisso v. Law Offices of Bruce E. Baldinger, LLC*, No. 11-CV-1996, 2011 WL 5117604, at *2 (E.D.N.Y. Oct. 24, 2011); *Shmerkocvich v. RMC Consulting Group LLC*, No. 09-CV-5490, 2011 WL 887871, at *4 (E.D.N.Y. Jan. 31, 2011), *adopted by* 2011 WL 900850 (E.D.N.Y. Mar. 14, 2011).  Although the FDCPA does not define the statutory term "transaction" used in the FDCPA's definition of a "debt," the "consensus judicial interpretation is reflected in the Seventh Circuit's ruling that the statute is limited in its reach 'to those obligations to pay arising from consensual transactions, where parties negotiate or contract for consumer-related goods or services.'" *Turner v. Cook,* 362 F.3d 1219, 1227 (9th Cir. 2004) (*quoting Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.,* 111 F.3d 1322, 1326 (7th Cir.1997)); *see also Beggs*, 145 F.3d at 512 (holding that mandatorily imposed taxes do not arise from a consensual exchange and thus do not constitute debts under the FDCPA); *Beal v. Himmel & Bernstein,*

28

*LLP*, 615 F. Supp. 2d 214, 216 (S.D.N.Y. 2009) (citing *Turner*, 362 F.3d at 1227).

The only "debts" alleged by Plaintiffs in this action are the New York City Tax Liens composed of mandatory property tax, water, and sewer obligations.  (*See* Compl. ¶ 146.) Accordingly, at issue here is whether those Tax Liens constitute debts subject to the FDCPA.  The parties concede, as they must, that property tax obligations are not debts under the FDCPA. *See, e.g.*, *Beggs*, 145 F.3d at 512; *Staub v. Harris*, 626 F.2d 275, 278-79 (3d Cir. 1980) (holding that the FDCPA "does not apply to practices occurring in the course of collection of taxes").  The parties disagree, however, on the issue of whether the mandatory water and sewer charges that are included in and treated as Tax Liens under the New York City Administrative Code qualify as debts falling under the protection of the statute. The FDCPA's text and legislative history are bereft of explicit guidance on the issue, and the Second Circuit has had no occasion to address this narrow question.  Nevertheless, the Second Circuit and other federal courts of appeals have provided considerable interpretive guidance in determining the type of "transaction" necessary to qualify as a debt under the FDCPA.

In *Beggs*, the Second Circuit held that taxes mandatorily imposed on automobiles by the defendant municipality

29

did not qualify as debts under the FDCPA. 145 F.3d at 512.  In
so holding, the Second Circuit reasoned that the automobile tax
"is not levied upon the purchase or registration of the vehicle
*per se*, but rather upon the ownership of the vehicle by the
citizen." *Id.*  The Second Circuit thus determined that there was
"simply no 'transaction' . . . of the kind contemplated by
statute." *Id.*  Central to the Second Circuit's holding was the
conclusion that the "'relationship between taxpayer and taxing
authority does not encompass that type of *pro tanto* exchange
which the statutory definition envisages.'" *Id.* (quoting *Staub*,
626 F.2d at 278).  Under *Beggs*, an obligation levied upon a
citizen as an incident to property ownership does not arise from
a "transaction" and thus does not qualify as a debt under the
FDCPA. *See id.*

Other federal courts of appeals confirm the Second
Circuit's interpretive approach in *Beggs* and further clarify
that the statutory definition of "debt" contemplates a
*consensual* transaction, where parties "negotiate or contract"
for consumer services or goods. *Turner,* 362 F.3d at 1227
(citations omitted); *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d
1367, 1371 (11th Cir. 1998) ("[A]t a minimum, a 'transaction'
under the FDCPA must involve some kind of business dealing or
other consensual obligation."); *Bass*, 111 F.3d at 1326 ("[T]he

30

FDCPA limits its reach to those obligations to pay arising from consensual transactions, where parties negotiate or contract for consumer-related goods or services.").[10]

Indeed, the Eleventh Circuit's analysis in *Hawthorne* is particularly instructive:

> The ordinary meaning of "transaction" necessarily implies some type of business dealing between parties. *See Webster's New Collegiate Dictionary* 1230 (1979) (defining "transaction" as "a business deal"); *Bass,* 111 F.3d at 1325 (citing *Webster's New World Dictionary* 1509 (2d ed. 1986)). In other words, when we speak of "transactions," we refer to consensual or contractual arrangements . . . . While we do not hold that every consensual or business dealing constitutes a "transaction" triggering application of the FDCPA (such a holding would be contrary to the plain language of the statute limiting applicability to specified transactions, as well as to other portions of the statute not relevant to this analysis, which require the existence of other

---

[10] Numerous district courts similarly interpret "debt" as requiring a consensual, negotiated transaction or a business dealing. *See, e.g., Bell v. Providence Cmty. Corr., Inc.*, No. 3:11-CV-00203, 2011 WL 2218600, at *4 (M.D. Tenn. June 7, 2011)("A 'transaction' is not defined in the FDCPA, but it has been held to connote a business deal between the parties and a consensual obligation."); *Reid v. Am. Traffic Solutions, Inc.*, No. 10—CV-204, 2010 WL 5289108,at *4 (S.D. Ill. Dec. 20, 2010) ("Implicit in the understanding of a transaction for FDCPA purposes is that the business deal or agreement is consensual and that the parties have negotiated or contracted for consumer goods or services."); *Graham v. ACS State & Local Solutions, Inc.*, No. 06-CV-2708, 2006 WL 2911780, at *1 (D. Minn. Oct. 10, 2006) ("At a minimum, the transaction must involve a business dealing or other consensual consumer obligation."); *Williams v. Allocated Bus. Mgmt., LLC*, No. 10-CV-1711, 2010 WL 2330371, at *2 (N.D. Ill. June 8, 2010); *Durso v. Summer Brook Pres. Homeowners Ass'n*, 641 F. Supp. 2d 1256, 1263-64 (M.D. Fla. 2008); *Betts v. Equifax Credit Info. Servs., Inc.*, 245 F. Supp. 2d 1130, 1133-34 (W.D. Wash. 2003) ("The impoundment of one's vehicle and statutory liability that necessarily attaches are not akin to even a broad interpretation of a contractual, business, or otherwise consensual arrangement for services rendered.").

> conditions before the FDCPA applies), at a
> minimum, a "transaction" under the FDCPA must
> involve some kind of business dealing or other
> consensual obligation. Because Hawthorne's
> alleged obligation to pay Mac Adjustment for
> damages arising out of an accident does not
> arise out of any consensual or business
> dealing, plainly it does not constitute a
> "transaction" under the FDCPA.

140 F.3d at 1371 (citation omitted).

Here, as in *Hawthorne*, Plaintiffs can point to no such consensual, negotiated transaction or business dealing giving rise to the water and sewer obligations secured by the Tax Liens.  Jones and Boyd did not negotiate or enter into any contract or agreement with the City with respect to the utility charges.[11]  Nor could they.  Instead, the properties owned by Jones and Boyd were required by the New York City Administrative Code to be connected to City water and sewage mains and be supplied with water at rates provided by the City.  *See* N.Y.C. Admin. Code § 27-2024.[12]  The payment by property owners of the water and sewer charges associated with that mandatory

---

[11] In fact, the record is devoid of evidence that Joan or Boyd ever communicated at all with the City regarding their water and sewer obligations prior to the accrual of those obligations.

[12] Section 27-2024 of the New York City Administrative Code provides that "[t]he owner of a dwelling shall provide and maintain a supply of pure and wholesome water sufficient in quantity and at sufficient pressure to keep all plumbing fixtures adequately supplied for their sanitary maintenance. Where water mains are available in the street, every dwelling shall be supplied with water from such mains." N.Y.C. Admin. Code § 27-2024. Although the Administrative Code only obligates use of city water mains where those mains are available in the street, Plaintiffs do not argue or present evidence that the Jones or Boyd Properties are located in areas where water mains are unavailable.

connection did not arise from a consensual consumer transaction
or any other type of business dealing, as required to invoke the
FDCPA. *See Hawthorne*, 140 F.3d at 1371.  To the contrary, the
City levied water and sewer charges "as an incident to property
ownership." (ECF No. 230, Plaintiffs' Opposition to Defendants'
Motions for Summary Judgment ("Pls.' Opp."), at 2.)  Stated
differently, the City established an administrative scheme for
the disbursement of public utilities to its inhabitants and does
not bargain for or enter into agreements with citizens to
determine their water and sewer obligations.  Owners of real
property in New York City are required to utilize available New
York City water mains to supply their sewer service and water,
payment for which is determined by terms imposed by the City,
based on street frontage or water meters.  *See* N.Y. Pub. Auth.
Law §§ 1045-j(1),(4).[13]

Consequently, as in *Beggs*, where the defendant
municipality's automobile tax was "not levied upon the purchase
or registration of the vehicle *per se*, but rather upon the
ownership of the vehicle by the citizen," 145 F.3d at 512, the

---

[13] This conclusion applies with equal force to both the Jones
Property, where water and sewer charges were calculated as "frontage charges"
predicated upon the physical attributes of the property, such as the width of
the building frontage or number of dwelling units, and the Boyd Property,
which had a water meter to measure usage.  (Trust 56.1 Stmt. ¶ 1.; Pls.'
Resp. to Trust 56.1 Stmt. ¶ 1.)  Thus, Plaintiff Boyd's argument that her
water meter brings the charges within the FDCPA's definition of a debt is
unavailing.

water and sewer charges imposed on Jones and Boyd in this case were mandatorily imposed upon their ownership of property as homeowners.  Indeed, according to the New York City Department of Environmental Protection, New York City's "water and sewer infrastructure is funded by revenue it collects through water and sewer rates" from the City's property owners. *See* N.Y.C. Environmental Protection, "About DEP Water Rates," http://home.nyc.gov/html/dep/html/water_rates/index.shtml (last visited Oct. 2, 2012).  Thus, the water and sewer obligations, like taxes, are imposed upon New York City property owners to fund a public service: maintenance of the City's water and sewer infrastructure.  Despite Plaintiffs' protestations to the contrary, the relationship between the City and Plaintiffs here resembles more the relationship between taxpayer and taxing authority than it does the consensual, transactional "pro tanto exchange" between parties envisaged by the statutory definition of debt. *See Beggs*, 145 F.3d at 512.

Moreover, the city ordinance regulating the imposition of sewer and water charges reinforces this conclusion.  Section 1045-j(5) of the City's Public Authority Law provides in relevant part with respect to sewer and water charges:

> [s]uch fees, rates, rents or other charges,
> if not paid when due, shall constitute a
> lien upon the premises served . . . , which

34

> lien . . . shall bear interest at the same
> rate as would unpaid taxes of the city. Such
> lien . . . may be foreclosed against the lot
> or building served *in the same manner as a*
> *lien for such taxes*.

N.Y. Pub. Auth. Law § 1045-j(5) (emphasis added). This ordinance confirms that water and sewer charges are to be treated in the same manner as taxes, further supporting the court's determination that water and sewer charges at issue in this action are more analogous to property taxes than to consumer debts. *See id.* Like taxes, water and sewer fees are non-negotiable charges mandatorily levied upon citizens for public utilities or services provided by the City to the general public.[14]

That the Boyd Property was metered based on rates and parameters dictated by the City for water usage does not alter the court's analysis. Though metered usage arguably may be one factor in determining the nature of a lien, no court has held

---

[14]Moreover, as Defendants correctly observe, Plaintiffs rely on N.Y. Pub. Auth. Law § 1045-j, among other tax ordinances, in their underlying opposition papers to support their argument that Jones and Boyd have a right to interest on refunded overpayments under the FDCPA. (Pls.' Opp. at 37.) In fact, Plaintiffs insist that "state laws covering the collection of city taxes apply to the collection of the payments at issue," including the water and sewer charges included in the Tax Liens. (*Id.*) In essence, Plaintiffs have requested that the court treat the underlying obligations as taxes that bear interest in this litigation, acknowledging that the utility charges secured under the Tax Liens are not debts. Additionally, in the October 24, 2002 Jones Payoff Quote Request, the form submitted on behalf of Jones identifies the amount of estimated legal fees and also contains a blank space for the "Taxpayer Name." (10/24/02 Jones Payoff Quote Request, at JER2 00240.) At the very least, this suggests that the Tax Lien was recognized as a tax rather than a debt.

that it is the determinative factor, and the facts before the court warrant no such finding.  Furthermore, Plaintiffs cite no authority holding that metered water or sewer charges are *per se* debts under the FDCPA.  The City's method of calculating the water and sewer rates and obligations imposed upon the Boyd Property does not transform the City's mandatory charges into consensual transactions based on negotiations or business dealings.  Significantly, there is no evidence in the record that Boyd even requested water and sewer services from the City after such a negotiation or business dealing or any form of exchange with the City.  It is undisputed that, as a property owner, Boyd was required to avail herself of City resources and pay concomitant charges for those resources as she used them, irrespective of the method by which the charges were determined by the City.  *See* N.Y.C. Admin. Code § 27-2024 (requiring New York City property owners to connect their property to City water mains).

The record confirms that Jones and Boyd did not enter into any contract with the City regarding the water and sewer obligations, and Plaintiffs point to no evidence from which a reasonable trier of fact could determine that Jones and Boyd entered into any consensual transactions with the City for utility services.  Accordingly, the court finds that the water

and sewer obligations secured by the Liens do not arise from a
consensual transaction and thus do not constitute debts under
the FDCPA.  *See Bass*, 111 F.3d at 1326 ("[T]he FDCPA limits its
reach to those obligations to pay arising from consensual
transactions, where parties negotiate or contract for consumer-
related goods or services.").

Plaintiffs' reliance upon the Third Circuit's
reasoning in *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379
(3d Cir. 2000) is unavailing.  Although the court acknowledges
that *Pollice* addressed whether Pittsburgh's municipal water and
sewer obligations qualified as debts under the FDCPA, *Pollice* is
inapposite in light of the distinct facts of this case.  In
*Pollice*, the Third Circuit held that Pittsburgh's municipal tax
liens, composed of water and sewer obligations, qualified as
debts under the FDCPA. *Id.* at 400.  The Third Circuit reasoned
that these obligations constituted debts because "homeowners
('consumers' of water and sewer services) had an 'obligation . .
. to pay money' to the government entities which arose out of a
'transaction' (*requesting water and sewer service*) the subject
of which was 'services . . . primarily for personal, family, or
household purposes.'" *Id.* (emphasis added).  Furthermore, the
Third Circuit acknowledged that property taxes, unlike water or
sewer obligations, did not constitute debts because the

37

"relationship between taxpayer and taxing authority does not encompass the type of pro tanto exchange which the statutory definition [of 'debt'] envisages." *Id.* at 401 (quoting *Staub*, 626, F.2d at 278). *Pollice,* however, is distinguishable from the factual record presented here.

The *Pollice* court determined that the water and sewer obligations arose from a transaction because there was a "request[]" for water and sewer services. *Id.* at 400. The Third Circuit found essential the consensual nature of the transaction between the homeowners and the City of Pittsburgh regarding the provision of water and sewer services. *See id.* A "transaction" existed, in the Third Circuit's view, because there was a voluntary request for resources provided by the City of Pittsburgh. *See id.* As explained above, no such transaction exists with respect to the Jones and Boyd Tax Liens because there is no evidence in the record that either Jones or Boyd made any "request" to connect to the City's water and sewer mains in order to avail themselves of the City's water and sewer services; rather, they were required by law to do so and to pay the City accordingly.[15]

---

[15] Additionally, in Pittsburgh, unlike in New York City, it appears that homeowners who wished to use municipal utilities "applied" for water and sewer services. *See Piper v. Portnoff Law Assocs., Ltd.*, 396 F.3d 227, 233 n.8 (3d Cir. 2005) (discussing *Pollice* and the City of Pittsburgh's water charges). This supports the court's conclusion that *Pollice* involved a

Subsequent cases interpreting *Pollice* support this analysis.  For example, in *Piper v. Portnoff Law Assocs.*, *Ltd.*, 396 F.3d 227 (3d Cir. 2005), the Third Circuit expounded upon *Pollice*, opining that they "think it clear from *Pollice* that whenever a homeowner *voluntarily elects to avail himself* of municipal water/sewer services . . . and thereby incurs an obligation to pay for such services, there is the kind of *pro tanto* exchange contemplated by the FDCPA."  396 F.3d at 233 n.8 (quoting *Pollice*, 225 F.3d at 401).  *Pollice* and *Piper* therefore reflect the consensus view that a transaction must be a "consensual" endeavor in which the parties enter into a contract, business dealing, or negotiation regarding services primarily for household purposes. *See Turner,* 362 F.3d at 1227.

Unlike Plaintiffs in *Pollice* or *Piper*, Jones and Boyd did not "*voluntarily elect*[]" to avail themselves of municipal water or sewer services, *Piper*, 396 F.3d at 233 n.8; they were required to do so by municipal law.  Moreover, as Defendants correctly observe, Plaintiffs have not demonstrated that the administrative regime for water and sewer services in the City of Pittsburgh is in any way similar to the administrative regime

---

consensual transaction in which the plaintiff property owners voluntarily entered into agreements with the Pittsburgh municipal water authority. The record lacks any evidence that such an analogous application process exists in New York City.  To the contrary, it is undisputed that Boyd and Jones were required to use City water mains for water and sewage purposes.

in the City of New York.[16]  Thus, *Pollice* is inapplicable here

because New York City leaves no room for a voluntary or

consensual transaction between parties regarding the provision

of water and sewer services.[17]

Finally, unlike the Tax Liens on the Jones and Boyd

Properties, the liens in *Pollice* do not appear to be bundled

liens composed of tax and utility obligations. *See Pollice*, 225

F.3d at 385-86, 400-01 (discussing the water claims as distinct

from the tax claims).  This distinction demonstrates two key

points.  First, the New York City Tax Liens in this case

explicitly included unpaid taxes and sewage and water charges as

mandated by the New York City Administrative Code, and thus are

different, and more tax-like, in nature than the Pittsburgh

---

[16] In New York City, the municipal water board appears to serve as
the sole water and sewage provider; however, the same is not true for the
City of Pittsburgh, where private companies also serve the water and sewage
needs of property owners and serve as an alternative to municipal public
utilities. *See, e.g.*, Pennsylvania American Water Company,
http://www.amwater.com/paaw/about-us/page9704.html (last visited Oct. 2,
2012).  Plaintiffs offer no evidence showing that there were alternative
water or sewer suppliers for New York City property owners or that New York
City property owners had the ability to negotiate rates or seek the services
of other providers.

[17] It is of no moment that the Servicing Agreement between the
Trust Defendants and JER Defendants provided that "the servicing of the water
and sewer component of Tax Liens on certain residential Properties *may*
require special procedures to assure that the actions of the Servicer in
servicing such Liens do not violate the federal Fair Debt Collection
Practices Act." (ECF No. 233, Exh. D, Servicing Agreement Between Trust
Defendants and JER Defendants ("Servicing Agreement"), at 16, § 2.02(c)
(emphasis added).) Through this statement, Defendants merely expressed
caution regarding the potential relevance of the FDCPA in connection with
servicing portions of the liens on certain properties, without conceding its
applicability or agreeing that the Tax Liens are debts.  Moreover, Plaintiffs
have not argued to the contrary.

municipal liens at issue in *Pollice*.  In *Pollice*, the Third Circuit subjected the water and sewer liens to FDCPA analysis while excluding the tax liens from similar scrutiny; the *Pollice* court did not consider or rule on liens with mixed obligations bundled into one instrument, which includes substantial tax obligations. *See id.*  Thus, *Pollice* is not persuasive here. Second, with respect to the Boyd Property, only approximately twenty percent of the Tax Lien constituted delinquent utility charges. (Trust Mem. at 6-7; JER 56.1 Stmt. ¶ 19; Pls.' Resp. to JER 56.1 Stmt. ¶ 19.)  Even assuming, without concluding, that the water and sewer charges in this case were transactional in nature, the Boyd Tax Lien would still not constitute a debt under the FDCPA because a debt must arise out of a transaction the subject of which is "*primarily* for personal, family, or household purposes." 15 U.S.C. § 1692a(5) (emphasis added).  No reasonable trier of fact could find that the Boyd Tax Lien, eighty percent of which was real estate tax arrearage, involved a transaction the subject of which is primarily for personal, family, or household use. *Cf. Bloom v. I.C. Sys., Inc.*, 972 F.2d 1067, 1068 (9th Cir. 1992) (stating that courts should "examine the transaction as a whole" in determining the nature of a debt obligation).  Thus, the Boyd Tax Lien is not covered by the FDCPA for this reason as well.

In sum, the court holds that the Jones and Boyd Tax Liens are not debts within the meaning of the FDCPA.  In doing so, the court notes the limited nature of this narrow holding. Specifically, a New York City tax lien that consists of delinquent mandatory utility charges and property taxes does not constitute a debt within the meaning of the FDCPA.  Thus, the court sustains Defendants' first objection to Judge Reyes' R&R and dismisses Jones' and Boyd's FDCPA claims in their entirety.

**B.   Objection Two: The FDCPA Does Not Apply to the Enforcement of Security Interests Against Property.**

Defendants further object to the R&R to the extent that it did not consider their alternative ground for summary judgment.  (JER Obj. at 7.)  Defendants maintain that even assuming that the Tax Liens constitute debts within the meaning of the FDCPA, Defendants' efforts to enforce and foreclose on those Tax Liens constitute the "mere enforcement of [a] security interest[] against property," as opposed to debt collection activities subject to §§ 1692e and 1692f of the FDCPA. (*Id.*)  To support this contention, Defendants rely upon *Montgomery v. Huntington Bank*, 346 F.3d 693 (6th Cir. 2003) and numerous other district court cases for the proposition that the enforcement of a security interest is not debt collection activity under the FDCPA. (JER Obj. at 7-8.)  In light of such authority,

Defendants urge the court to dismiss the remaining FDCPA claims because "the settled property foreclosures involved the enforcement of security interests represented by the tax liens," for which FDCPA §§ 1692e and 1692f provide no protection. (*Id.* at 8.)

The court finds that the foreclosure actions on liens against Plaintiffs' interests in their properties, including any fees and costs arising directly from and solely because of the foreclosures, did not seek monetary judgments against debtor-property owners and consequently were not debt collection activities actionable under §§ 1692e and 1692f. Rather, Defendants acted to enforce their security interests through foreclosures of the Tax Liens and sale of the properties, from which proceeds Defendants would obtain the tax lien amounts and attorneys' fees and legal costs that arose from the foreclosures.[18]  The court therefore sustains Defendants' second objection and dismisses Defendants' FDCPA claims for this reason as well.

The parties do not dispute that Defendants are "debt collectors" under the FDCPA in their objection papers.  Rather,

---

[18] The court notes that the attorneys' fees and costs at issue in this case are part and parcel of JER Defendants' attempts to foreclose on the Tax Lien.  It is undisputed that but for the imposition of the Tax Lien and Defendants' actions to foreclose on those liens, the attorneys' fees and costs would not have accrued.

at issue here, apart from whether the Tax Liens are debts, is the separate question of whether Defendants' enforcement of the Tax Liens – by commencing foreclosures against properties as opposed to civil actions against property owners seeking money judgments – constitutes debt collection activity subject to §§ 1692e and 1692f of the FDCPA. *See Kaltenbach v. Richards*, 464 F.3d 524, 529 (5th Cir. 2006) ("Whether a debt collector's specific action qualifies as the collection of a debt . . . is a separate inquiry from whether the party meets the general statutory definition of a debt collector."); *Gray v. Four Oak Court Ass'n, Inc.*, 580 F. Supp. 2d 883, 886-87 (D. Minn. 2008). Sections 1692e and 1692f of the FDCPA prohibit a debt collector from making false or misleading representations or using unfair means when collecting a debt. *See* 15 U.S.C. § 1692e (prohibiting false or misleading representation "in connection with the collection of any debt"); 15 U.S.C. § 1692f (prohibiting the use of unfair or deceptive means "to collect or attempt to collect any debt").

Plaintiffs mistakenly rely on *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S. Ct. 1605 (2010) in asserting that "the U.S. Supreme Court recently held that a law firm was subject to FDCPA liability for a misrepresentation made in a Complaint filed in an Ohio mortgage foreclosure action."

44

(Pls.' Resp. to Obj. at 6.)  In *Jerman*, however, the Supreme
Court did not explicitly consider the applicability of the FDCPA
to a mortgage foreclosure action but, instead, considered
whether the *bona fide* error defense in the FDCPA (§ 1692k(c))
applied to the lawyers' actions. 130 S. Ct. at 1609.[19]  Although
both Defendants asserted this affirmative defense in their
Answers, they did not move for summary judgment on this basis.
In any event, the majority of federal courts have clarified
that, unless a monetary judgment is sought against the debtor,
the "enforcement of a security interest through the foreclosure
process is not debt collection for purposes of the Act." *Warren
v. Countrywide Home Loans, Inc.,* 342 F. App'x 458, 460 (11th
Cir. 2009); *see, e.g.*, *Montgomery*, 346 F.3d at 700 ("[A]n
enforcer of a security interest, such as a repossession agency,
falls outside the ambit of the FDCPA for all purposes, except
for the purposes of § 1692f(6)." (internal quotation marks
omitted))[20]; *Diaz v. Florida Default Law Group, P.L.*, No. 3:09-CV-

---

[19] Significantly, the threshold issue of whether a mortgage
foreclosure is subject to the FDCPA was not a question upon which certiorari
was granted by the Supreme Court.
[20] Section 1692f(6)(A) of the FDCPA, which applies to the
"[t]aking or threatening to take nonjudicial action to effect dispossession .
. . of property if there is no present right to possession of the property
claimed as collateral through an enforceable security interest," serves as an
exception to this rule.  That FDCPA provision is not applicable here because
the record is devoid of any evidence that Defendants have threatened to take
nonjudicial action to dispossess property over which there is no present
right of possession claimed as collateral through an enforceable security
interest.  Moreover, Plaintiffs do not invoke § 1692f(6)(A) and have not

524, 2011 WL 2456049, at *2 (M.D. Fla. Jan. 3, 2011); *Gray*, 580
F. Supp. 2d at 888; *Acosta v. Campbell*, No. 6:04-CV-761, 2006 WL
3804729, at *4 (M.D. Fla. Dec. 22, 2006), *aff'd*, 309 F. App'x
315 (11th Cir. 2009); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 924
(N.D. Ind. 2004); *Heinemann v. Jim Walter Homes, Inc.*, 47 F.
Supp. 2d 716, 722 (N.D.W. Va. 1998), *aff'd*, 173 F.3d 850 (4th
Cir. 1999).  As such, the weight of legal authority supports the
proposition that non-judicial foreclosure proceedings generally
do not constitute debt collection activities covered by the
FDCPA.[21]

          In response, Plaintiffs argue that *judicial*
foreclosure proceedings like those commenced by Defendants are
subject to the FDCPA because of the possibility of obtaining a
deficiency monetary judgment against the property owner,
rendering the foreclosure proceeding an attempt to collect a
debt from the property owner. (*See* Pls.' Resp. to Obj. at 5-6.)
As Plaintiffs correctly observe, "several district courts have
distinguished between judicial and non-judicial foreclosures and

---

alleged any facts to support liability under this provision.
          [21] Citing to *Wilson v. Draper & Goldberg, P.L.L.C.,* 443 F.3d 373,
376 (4th Cir. 2006), Plaintiffs contend that the "clear weight of authority
demonstrates that the FDCPA *does* apply to parties enforcing security
interests" even in the non-judicial foreclosure context. (Pls.' Resp. to Obj.
at 5 n.3.)  This is not so.  "Although Plaintiffs point to a case from the
Fourth Circuit holding that foreclosure can be debt collection (*see Wilson v.
Draper & Goldberg,* 443 F.3d 373, 376-77 (4th Cir.2006)), the weight of
authority is to the contrary." *Odinma v. Aurora Loan Servs.*, No. 09-CV-4674,
2010 WL 2232169, at *12 (N.D. Cal. June 3, 2010); *see also* cases cited *supra*.

concluded the FDCPA applies to the former but not the latter." *Maynard v. Cannon*, 401 F. App'x 389, 394 (10th Cir. 2010) (citing cases).  Although acknowledging this distinction, the court does not find it to be dispositive and declines to apply a categorical rule finding that judicial foreclosures in New York *per se* constitute debt collection activities under the FDCPA. In *Maynard*, the Eleventh Circuit explained that, in distinguishing judicial from non-judicial foreclosures, courts "have relied heavily on one principal distinction between the two types of foreclosure – the presence or absence of a personal judgment against the mortgagor. In other words, these courts have found non-judicial foreclosures are not debt collections, because they do not require the consumer to pay any money at all." *Id.* (citing *McDaniel v. South & Assocs.*, 325 F. Supp. 2d 1210, 1217 (D. Kan. 2004)).  Thus, the fundamental distinction between judicial and non-judicial foreclosures is that "a *typical* judicial foreclosure *usually* does involve seeking a personal judgment against the debtor for a deficiency and hence would likely amount to debt collection." *Fouche' v. Shapiro & Massey L.L.P.*, 575 F. Supp. 2d 776, 786 (S.D. Miss. 2008) (emphasis added).

Here, the foreclosure complaints did not request monetary judgments against any of the plaintiffs for any

47

deficiencies and instead proceeded solely against the respective properties subject to the Tax Liens. (Chilson Aff. ¶ 16; *see also* Jones Foreclosure Compl.; Boyd Foreclosure Compl.; Warters Foreclosure Compl; Taylor Foreclosure Compl.)  Indeed, a deficiency was highly unlikely, given the relatively small amount of the unpaid taxes, water, and sewer charges and estimated fees and costs, all of which would have been paid from the proceeds of a foreclosure judgment sale.  It is well-settled that, in New York, "the action to enforce [a] lien remains equitable, not legal, in nature." *Salerno Painting & Coating Corp. v. Nat'l Neurolabs, Inc.*, 842 N.Y.S.2d 81, 82 (N.Y. App. Div. 2d Dep't 2007).  Thus, the distinction between judicial and non-judicial foreclosures is immaterial in this case because Defendants' judicial foreclosures did not attempt to collect money from the debtor with respect to the underlying tax, water, and sewage charges or the fees, disbursements, and costs that arose from the foreclosures.  *See McDaniel*, 325 F. Supp. 2d at 1217 ("Foreclosure . . . is not the enforcement of the obligation because it is not an attempt to collect funds from the debtor.").  The FDCPA's purpose is "to protect consumers from debt collectors attempting to collect funds, not attempts to foreclose interests in property." *Id.*  Thus, the FDCPA's

consumer protection purpose was not triggered by the
foreclosures here.

The Second Circuit's holding in *Romea v. Heiberger &
Assocs.*, 163 F.3d 111 (2d Cir. 1998) – which Plaintiffs do not
cite – does not command a different result.  In *Romea*, the
Second Circuit held that a defendant law firm's letter to the
plaintiff-tenant prior to the initiation of a possessory *in rem*
action to recover the client landlord's premises constituted a
communication protected by the FDCPA. *Id.* at 116.  The Second
Circuit rejected the defendant's contention that the letter was
not subject to FDCPA protection because it was a "statutory
condition precedent" to commencing summary eviction. *Id.*  The
*Romea* court held that because the letter "conveyed information
regarding a debt" to another person, it was a "communication" as
defined by the FDCPA. *Id.*  Because defendant "ma[de] no attempt
to deny that its aim in sending the letter was at least in part
to induce [plaintiff] to pay the back rent she allegedly owed,"
the court ultimately concluded that the delivery of the letter
constituted debt collection activity.  *Id.*

*Romea* is distinguishable from the facts presented here
and is therefore not controlling.  First, unlike in *Romea* where
the defendant initiated contact with the plaintiff to induce the
plaintiff to pay her back rent, JER Defendants here were merely

responding to requests for payoff quotes initiated by Plaintiffs
to resolve the foreclosure actions. *See id.*   Second, in contrast
to *Romea*, where the communications occurred prior to summary
*eviction* proceedings, Defendants here responded to Plaintiffs'
requests during the pendency of *foreclosure* proceedings. *See id.*
Far from a communication intending to induce Plaintiffs to pay
the underlying obligations, the payoff quotes transmitted by JER
Defendants were sent to provide Plaintiffs with information
necessary to facilitate Plaintiffs' desire to discontinue the
foreclosure actions.   Third, in *Romea*, the Second Circuit did
not purport to rule on whether a lien foreclosure, as opposed to
an eviction proceeding, constituted the enforcement of a
security interest or whether payoff letters sent to resolve a
foreclosure process constituted debt collection activities. *See
id.   Romea* is therefore inapposite.

Moreover, the Second Circuit's reasoning in *Romea* did
not preclude the District of Connecticut from recently holding
that filing a foreclosure action in state court was not
actionable under the FDCPA because "a foreclosure action is not
a legal action to enforce a debt but rather an equitable action
to enforce a security interest rather than a debt collection."
*Derisme v. Hunt Leibert Jacobson P.C.*, No. 3:10-CV-244, 2012 WL
3000398, at *14 (D. Conn. July 23, 2012).   The district court

concluded that "an enforcer of a security interest is only subject to § 1692f(6) and not any other section of the FDCPA." *Id.* at *19 (citing cases).  Finally, the district court concluded that because the defendant "has not filed a motion for a deficiency judgment it has not engaged in conduct related to the collection of money and consequently the provisions of [the FDCPA] are not applicable to its conduct." *Id.* at *20. Similarly here, Defendants have not sought a deficiency judgment, but instead proceeded solely against the Jones and Boyd Properties in an equitable action to foreclose the Tax Liens.  Consequently, Defendants' actions constitute the enforcement of a security interest not subject to the protections of the FDCPA. *See id.*

In a final attempt to salvage their claims, Plaintiffs argue that even if the foreclosure proceedings were not subject to the FDCPA, Defendants' correspondence with Plaintiffs demanding attorney's fees and expenses at unspecified points before, during, and after the foreclosures were debt collection activities within the bounds of the FDCPA. (Pls.' Resp. to Obj. at 6.)  Plaintiffs cite to no evidence in the record that Defendants initiated direct correspondence with Plaintiffs Boyd and Jones to demand payment or attorneys' fees and costs. Plaintiffs instead rely on *Rousseau v. Bank of N.Y.*, No. 08-CV-

205, 2009 U.S. Dist. LEXIS 90163, at *23-25 (D. Colo. Sept. 29, 2009), in which the district court noted that "if a defendant seeks to collect money apart from the foreclosure process, such action would come within the bounds of the [FDCPA]."

Plaintiffs' argument is flawed. Plaintiffs have not alleged in their complaint or otherwise that Defendants sought to collect attorneys' fees and costs apart from the foreclosure process.[22] Nor could they. The attorneys' fees and costs sought by JER Defendants were created by, and inextricably intertwined with, the ongoing foreclosure process. Plaintiffs have not established that absent the foreclosure process, any attorneys' fees and costs would have accrued and subsequently been charged to Plaintiffs. Thus, the record is devoid of evidence that any attorneys' fees and costs accrued apart from the enforcement of the Tax Liens through foreclosure actions.

---

[22] Boyd and Jones have not alleged that Defendants' correspondence with Plaintiffs prior to the foreclosure actions give rise to any FDCPA claims. (*See* Compl. ¶¶ 30-63, 145-57.) Jones only alleges that JER began to service the Tax Lien after its sale to the Trust Defendants but does not allege any impropriety associated with that pre-foreclosure servicing. (*Id.* ¶¶ 52-53.) Plaintiffs assert the existence of correspondence with Boyd and Jones "before . . . the foreclosure actions"; however, Plaintiffs do not cite to any admissible evidence that Defendants requested fees and costs prior to the commencement of the foreclosures. Rather, Plaintiffs concede that their claims are predicated upon Defendants' purported demands for attorneys' fees and costs and Defendants' allegedly improper collection of those fees and costs, both of which occurred after the commencement of foreclosure actions in response to requests initiated by Plaintiffs' counsel. (Pls.' Obj. at 10; Pls.' Opp. at 8.)

Furthermore, the supposed "demands" for attorneys' fees were not demands at all; rather, in response to inquiries initiated by Plaintiffs or their counsel, the JER Defendants provided Plaintiffs with what JER explicitly designated to be "estimates" of legal fees and costs that arose solely because of the foreclosure actions. (JER 56.1 Stmt. ¶¶ 60-62; Pls.' Resp. to JER 56.1 Stmt. ¶¶ 60-62; Jones Communication History, at JER2 0281-82; Thomas Boyd Communication History, at JER2 00385; 5/20/02 Boyd Payoff Quote.)  Plaintiffs have not presented evidence to establish that Defendants provided the payoff quotes to induce Boyd and Jones to pay the obligations secured under the Tax Liens.  Moreover, in the context of existing foreclosure actions in which the properties would have been sold, and the tax liens, costs, and disbursements would have been paid from the proceeds of the sale, Plaintiffs sought payoff quotes that were necessary to consummate the sales or refinance their properties.  Consequently, by providing estimates of attorneys' fees and costs at the request of Plaintiffs, Defendants were not seeking "to collect money apart from the foreclosure process," *Rousseau*, 2009 U.S. Dist. LEXIS 90163 at *23; Defendants were responding to Plaintiffs' inquiries on the amounts necessary to resolve and discontinue the ongoing foreclosure actions.  In responding to those inquiries, Defendants provided "estimated"

quotes for attorneys' fees and costs connected with the foreclosure actions, the payment of which would resolve the actions to foreclose the Liens. Plaintiffs belatedly attempt, without evidentiary support in the record, to characterize the JER Defendants' responses to settlement inquiries as Defendants' demands for payments of the delinquent Tax Liens and interrelated legal fees and costs.

Accordingly, because the judicial foreclosures against the Jones and Boyd Properties did not seek monetary judgments against individual debtors, those foreclosures actions, including Defendants' responses to Plaintiffs' payoff inquiries, are not debt collection activities under §§ 1692e and 1692f of the FDCPA. The court therefore sustains Defendants' second objection to Judge Reyes' R&R and dismisses Jones' and Boyd's FDCPA claims on this independent basis as well.

## II.  **Plaintiffs' Objections**

Plaintiffs lodge numerous objections to the R&R, challenging Judge Reyes' detailed recommendations on both the federal and state law claims.  In light of the court's dismissal of Plaintiffs' FDCPA claims, the court finds it unnecessary to reach Plaintiffs' objections on the merits of those claims and need not adopt Judge Reyes' recommendations on those claims at this point in time.

Furthermore, the court adopts Judge Reyes' recommendation to decline exercising supplemental jurisdiction over Plaintiffs' remaining state law claims, rendering Plaintiffs' objections on those claims moot. (R&R at 37.) Pursuant to 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over state law claims when the court has "dismissed all claims over which it has original jurisdiction."   Moreover, the Second Circuit has instructed that "federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986).   There are no exceptional circumstances warranting retention of federal jurisdiction over the state law claims in this case.   Having dismissed all claims over which the court has original jurisdiction, the court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.   *See* 28 U.S.C. § 1367(c)(3).

<u>**CONCLUSION**</u>

For the reasons set forth above, Judge Reyes' Report and Recommendation is adopted in part and modified in part. Accordingly, Defendants' respective motions for summary judgment are granted on the FDCPA claims, and the court declines to

exercise supplemental jurisdiction on the remaining state law
claims.  The Clerk of the Court is respectfully requested to
enter judgment in favor of Defendants and against Plaintiffs in
accordance with this decision and to close this case.

        **SO ORDERED.**

Dated:     October 2, 2012
           Brooklyn, New York

                              /s/
                    KIYO A. MATSUMOTO
                    United States District Judge
                    Eastern District of New York